UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| CARLOS CHRISTOPHER, | ) | Case No. 1:10CV2937 |
| | ) | |
| Petitioner, | ) | JUDGE SOLOMON OLIVER |
| | ) | |
| v. | ) | Magistrate Judge George J. Limbert |
| | ) | |
| TERRY TIBBALS, Warden, | ) | |
| | ) | |
| Respondent. | ) | **REPORT AND RECOMMENDATION** |
| | ) | **OF MAGISTRATE JUDGE** |
| | ) | |
| | ) | |

Petitioner Carlos Christopher ("Petitioner"), through counsel, has filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  ECF Dkt. #1.  He seeks relief for alleged constitutional violations that occurred during his Cuyahoga County, Ohio Court of Common Pleas convictions for aggravated murder in violation of Ohio Revised Code ("ORC") 2903.01(A)(1), aggravated robbery in violation of ORC 2911.01(A)(3), and aggravated burglary in violation of ORC 2911.11(A)(1).  On April 13, 2011, Respondent Terry Tibbals, Warden of Mansfield Correctional Institution ("Respondent"), filed a return of writ.  ECF Dkt. #8.

For the following reasons, the undersigned RECOMMENDS that the Court DISMISS the §2254 petition in its entirety with prejudice:

## I.    SYNOPSIS OF THE FACTS

The Eighth Appellate District Court of Appeals of Ohio set forth the facts of this case on direct appeal.  These binding factual findings "shall be presumed to be correct," and Petitioner has "the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. §2254(e)(1); *Warren v. Smith*, 161 F.3d 358, 360-361 (6th Cir. 1998), *cert. denie*d, 119 S.Ct. 2403 (1999).  As set forth by the Ohio Court of Appeals, the facts are:

> Appellant's convictions result from the July 29, 2007 killings of Richard Messina and his long-time fiancee, Sandra Cover, inside their South Euclid, Ohio home.  The killings stem from a progression of incidents that took place over the evening hours of July 28, 2007, through the night, and into the next morning.
>
> According to the testimony presented by the state's witnesses, on Friday, July 27, 2007, Richard Messina's eighteen year-old daughter, Tabitha Messina, came to stay with him and Cover for the weekend.  Tabitha lived

with her mother in Cleveland that summer, but planned to see her boyfriend, Jason Gaylord, on Saturday. That day, Jason was returning to his parents' South Euclid home from a long visit to the state of Georgia.

On Saturday evening, Richard drove Tabitha to the South Euclid "Home Days"FN1 celebration held at Bexley Park. Tabitha joined her friends, Jason and Tammy Tabak. Eventually, appellant also arrived.

FN1 Quotes indicate testimony given by a witness at trial.

Appellant at that time was Tammy's boyfriend, but he and Tabitha had once been close. That evening, Jason proposed marriage to Tabitha, and she agreed. This prompted appellant to propose to Tammy; Tammy accepted. The four friends left the park and walked to a nearby school to "hang out."

After midnight, Tabitha received a call on the cell phone she carried. The conversation became heated. When it was over, she indicated that her father "wanted the cell phone back that she had borrowed and she didn't want to go to give it back." Tabitha asked appellant to take the phone to her father's house.

While the other young people waited at the school, appellant ran to the Messina house. He returned a short time later, telling them "he had gotten into a physical altercation with Mr. Messina." Appellant's experience led Tabitha to seek "a private discussion" with him, which the two held as they walked from the school to another house on Stonehaven Road. The girls left briefly at 1:25 a.m.FN2 to obtain some cigarettes, and then rejoined their boyfriends.

FN2 A video recorder fixed the time of this event.

At 1:22 a.m., the South Euclid police received a call to respond to the Messina residence; Richard Messina reported that someone was "bothering his vehicles" parked in the driverway. Several police officers responded to Messina's call, including Officer Chris Khoenle.

After speaking with Messina, who indicated he "didn't want [appellant] around the property anymore," Khoenle and the other officers drove in the area, looking for the young people. They soon were located outside a house on Stonehaven. The officers stopped to talk with them, and then Khoenle took Tabitha back to the Messina house to "pick up some property."

At her father's house, Tabitha collected her dog and driver's license. She also engaged in an argument with Richard Messina. According to Khoenle,

"Richard said he didn't want her back at the house." Khoenle returned Tabitha to her friends, whereupon he advised "all parties * * * not to return" to the Messina residence. While Khoenle spoke to them, Tammy's mother came to take her home.

Jason, Tabitha, and appellant remained together only a short time before Tabitha told Jason she and appellant would "go and get" Tammy back. Tabitha and appellant left together; they were gone for several hours. Their absence was so prolonged that Jason called Tammy at 3:30 a.m. Tammy indicated she had not seen them.

-2-

At approximately 4:00 a.m., South Euclid police officer Dustin Smoot observed appellant and Tabitha sitting together on the sidewalk in front of the school, "holding hands and talking with each other." Appellant wore "bright green" shorts, a gray "muscle shirt," and a hat.

When appellant and Tabitha eventually returned to Jason, appellant "had a cut underneath his eye," and Tabitha had a cut on her hand. The hat, which was Jason's, was gone. Jason asked for an explanation for their lengthy absence, but they "lied to [him] and said they went to Tammy's house but they couldn't find her."

By this time, Jason was too tired to press the issue. Appellant and Tabitha left again with the promise that they would "be right back." They returned at approximately 7:00 a.m. with Richard Messina's two vehicles, a Corvette and a GMC Jimmy, along with Messina's other two dogs. They also wore different clothing.

Appellant then indicated he needed to go to his motel room "to pick up some stuff." He drove the Corvette while Tabitha and Jason followed in the truck. During the drive, Tabitha told Jason "she wanted to get married right away," and suggested they leave for Georgia. Jason noticed Tabitha seemed "upset."

When appellant retrieved his things, he stated he "wanted to start his life over," and thought it would be a good idea to go along. Tabitha contacted Tammy to invite her; they stopped to purchase "prepaid phones and drinks," then proceeded to Tammy's house. Jason also noticed Tabitha "had a lot of money on her."

Tammy, however, had misgivings about the plan. She requested to say a personal goodbye to some friends in Painesville, Ohio, and, once there, told appellant and the others she wanted to stay. One of her friends, Dustin Hruby, decided to go in her place. By late morning, appellant, Tabitha, Jason, and Dustin left in the two vehicles; they were on their way to Georgia.

Jason's mother, Renee Vlna, became worried when she had not heard from him by the afternoon of July 29, 2007. Since she knew he was in Tabitha's company, Vlna tried calling the Messina house, but received no answer.

Eventually, at approximately 4:00 p.m., Vlna drove with her daughter to the Messina residence. It appeared deserted, but lights were on inside the house. They checked and discovered a screen on the rear porch had been cut, and the glass on the door to the house was broken. Vlna called the police.

The police arrived to find both Messina and Cover dead in the master bedroom. Messina lay on the floor immediately next to the right side of the bed in a twisted position, with bedclothes placed over his face, and a cell phone and a crucifix by his head. Cover lay on the floor in a pool of blood near the left side of the bed, on her front, clad only in a sleep shirt.

The subsequent autopsy of Messina's body revealed he had suffered "six * * * chop wounds to the right side of his head and neck and several other blunt force injuries * * * on his head, right shoulder, and * * * right leg." In part, he had suffered "a fracture of the fifth cervical vertebra with the

-3-

transection of the vertebral artery and spinal cord contusion * * * ."  None of the wounds seemed "consistent with the defense-type wound."

Cover had numerous injuries.  Her body bore "lacerated defects which [were] consistent with a blunt force object"; these appeared on the back of her head, neck, and legs.  There were nine "patterned abrasions" to her back that might have been caused by a crowbar, her left arm had anterior contusions as if she had sought to ward off blows, and her left index finger was fractured.  The assistant coroner estimated the interval of time between her injuries and her death was four to six hours.

During the investigation of the murders, the police discovered in the master bedroom "a small strongbox safe * * * open" in front of the closet door, an open floor safe containing papers inside the closet, and a large jewelry box on a dresser with its drawers empty.  A hatchet lay on the bed in Tabitha's room.  Since the glass in the frame poster above the bed was broken, the hatchet appeared to have been thrown to where it landed.

Cover's purse was in the dining room.  Although the purse contained Richard Messina's wallet, neither the wallet nor the purse contained any money.

Outdoors, the police found in the shrubbery a hat and "gray muscle shirt and a white female tank type shirt that had wrapped within them a steak knife."  Several garden tools, including a shovel, also lay in the yard.  Light bulbs removed from the outdoor floodlights were "placed out neatly" on the ground.

The discovery of the bodies led to telephone calls to Tabitha's friends.  In turn, the friends telephoned Jason and Dustin.  By that time, appellant, Tabitha, Jason, and Dustin had stopped in West Virginia for a break.

Jason and Dustin, upon hearing of the discovery of the bodies, confronted their two companions, then turned back for Cleveland, driving the Corvette.  On Monday morning, July 30, 2007, a North Carolina sheriff's deputy apprehended appellant with Tabitha.

Appellant subsequently was indicted with Tabitha on twelve counts.  Counts one and two named Richard Messina as the victim and charged appellant with aggravated murder in violation of both R.C.  2903.01(A) and (B).  Counts three and four named Sandra Cover as the victim and charged appellant with aggravated murder in violation of both R.C. 2903.01(A) and (B).  All four counts contained a "course of conduct" and two felony murder specifications.

Counts five and six named Richard Messina as the victim and charged appellant with aggravated robbery in violation of both R.C. 2911.01(A)(1) and (A)(3).  Counts seven and eight named Sandra Cover as the victim and charged appellant with aggravated robbery in violation of both R.C. 2911.01(A)(1) and (A)(3).

Counts nine and ten named Richard Messina as the victim and charged appellant with aggravated burglary in violation of both R.C. 2911.11(A)(1) and (A)(2).  Counts eleven and twelve named Sandra Cover as the victim and charged appellant with aggravated burglary in violation of both R.C.

-4-

>             2911.11(A)(1) and (A)(2).  Counts five through twelve each contained two
>             firearm specifications.
>
>                   Appellant pleaded not guilty and waived his right to a jury trial.  After
>             the state presented its case, the three-judge panel granted appellant's motion
>             for acquittal as to all the firearm specifications, and as to counts ten and twelve.
>
>                   Ultimately, the panel found appellant guilty of counts one through four,
>             six, eight, nine and eleven.  Appellant was found not guilty on counts five and
>             seven.  Appellant received a prison sentence of life without the possibility of
>             parole on counts one through four, to be served concurrently with five years

on

>             each of the other counts.

ECF Dkt. #8-1 at 158-165.[1]

## II.   **PROCEDURAL HISTORY**

### A.   **State Trial Court**

In its May 2008 session, the Cuyahoga County, Ohio Grand Jury indicted Petitioner and Tabitha on two counts of aggravated murder in violation of ORC § 2903.01(A) and two counts of aggravated murder in violation of ORC § 2903.01(B) with four mass murder specifications and eight felony murder specifications; two counts of aggravated robbery in violation of ORC § 2911.01(A)(1) with four firearm specifications; two counts of aggravated robbery in violation of ORC § 2911.01(A)(3) with four firearm specifications; two counts of aggravated burglary in violation of ORC § 2911.11(A)(1) with four firearm specifications; and two counts of aggravated burglary in violation of ORC § 2911.11(A)(2) with four firearm specifications.  ECF Dkt. #8-1 at 89-100.

On May 16, 2008, the trial court granted the prosecutor's request to amend the specifications in counts 1-4 to delete the reference to mass murder and replace it with course of conduct language consistent with language set forth in a Ohio Supreme Court decision.  ECF Dkt. #8-1 at 101. Petitioner thereafter waived his right to a jury trial and elected to be tried in front of a three-judge panel.  *Id.* at 102.  On May 23, 2008, after the presentation of the State of Ohio's evidence at trial, the trial court granted in part and denied in part Petitioner's Ohio Criminal Rule 29 motion for judgment of acquittal, granting the motion as to all of the firearm specifications, and the aggravated

---

[1]  Page numbers in this report and recommendation refer to the Page ID# in the electronic filing system.

burglary counts charged in violation of ORC § 2911.11(A)(2).  *Id.* at 103.

Following the trial, the three-judge panel found Petitioner guilty on all remaining counts with specifications.  ECF Dkt. #8-1 at 104.  The trial court, following the penalty phase, issued its findings and thereafter sentenced Petitioner to life imprisonment without the possibility of parole on the merged aggravated murder convictions, and five years each on the remaining counts, to run concurrently.  *Id.* at 104-109.

**B.**     **Direct Appeal**

On July 7, 2008, Petitioner, through different counsel, filed a notice of appeal to the Ohio Court of Appeals for the Eighth District asserting the following sole assignment of error:

> THE VERDICTS FINDING THE APPELLANT GUILTY OF AGGRAVATED MURDER WAS VIOLATIVE OF DUE PROCESS AS IT WAS BASED UPON LEGALLY INSUFFICIENT EVIDENCE.

ECF Dkt. #8-1 at 110-111, 115-137.

On August 17, 2009, the Eighth District Court of Appeals denied the appeal and affirmed the trial court's judgment of conviction.  ECF Dkt. #8-1 at 155-168.

**C.**     **Supreme Court of Ohio**

On September 30, 2009, Petitioner, through different counsel, filed a notice of appeal to the Supreme Court of Ohio.  ECF Dkt. #8-1 at 169.  Petitioner filed a memorandum in support of jurisdiction, raising the following propositions of law:

> Proposition of Law No. 1:
>
> An instantaneous decision to purposefully kill another is insufficient evidence to establish the element of prior calculation and design pursuant to R.C. § 2903.01(A) and may not be presumed merely because the defendant purposely killed two people in the same course of conduct.
>
> Proposition of Law No. 2:
>
> Where a defendant is accompanied by a member of the residence in which a felony is committed, the defendant did not commit a trespass as required in the commission of an aggravated burglary.  R.C. § 2911.11.
>
> Proposition of Law No. 3:
>
> Where a defendant commits a theft offense following a homicide, the evidence must establish that the theft occurred immediately after the homicide in order for a conviction of aggravated robbery to be sustained, R.C. § 2911.01(A)(3).

*Id.* at 172.  On December 30, 2009, the Supreme Court of Ohio denied Petitioner leave to appeal and dismissed the appeal as not involving any substantial constitutional question.  *Id.* at 202.

## III.    28 U.S.C. § 2254 Petition

On December 29, 2010, Petitioner, through counsel, filed the instant petition for a writ of federal habeas corpus.  ECF Dkt. #1.  Petitioner raises the following grounds for relief in that petition:

> **FIRST CLAIM FOR RELIEF** (Sufficiency of Evidence)
>
> 2)    The evidence is insufficient to establish beyond a reasonable doubt that the Petitioner [] guilty of the aggravated murder or the capital specification.  The Petitioner is actually innocent of the offenses charged.
>
> **SECOND CLAIM FOR RELIEF** (Insufficient evidence for conviction of Felonious Assault[2] [sic])
>
> 30)    Viewed in a light most favorable to the state, the evidence presented at trial demonstrated that the Petitioner did not commit the offense of Aggravated Burglary in violation of Ohio Revised Code ¶ [sic] 2911.12 or the corresponding felony-murder specification pursuant to O.R.C. ¶ 2929.04(A)(7).  Jackson v. Virginia (1979), 443 U.S. 307.
>
> **THIRD CLAIM FOR RELIEF**
>
> 34)    Viewed in a light most favorable to the state, the evidence presented at trial demonstrated that the Petitioner did not commit the offense of Aggravated Robbery in violation of Ohio Revised Code ¶ 2911.11 or the corresponding felony-murder specification pursuant to O.R.C. ¶ 2929.04(A)(7).  Jackson v. Virginia (1979), 443 U.S. 307.

*Id.* at 21-29.  On April 13, 2011, Respondent filed an answer/return of writ.  ECF Dkt. #8.

## IV.    PROCEDURAL BARRIERS TO REVIEW

A petitioner must overcome several procedural barriers before a court will review the merits of a petition for a federal writ of habeas corpus.  As Justice O'Connor noted in *Daniels v. United States*, "Procedural barriers, such as statutes of limitations and rules concerning procedural default and exhaustion of remedies, operate to limit access to review on the merits of a constitutional claim."  532 U.S. 374, 381 (2001); *see also United States v. Olano*, 507 U.S. 725, 731 (1993).

---

[2] Petitioner must have made a clerical error in stating that the ground for relief was for the insufficiency of the evidence as to felonious assault as he was not convicted of that crime and the rest of this claim addresses aggravated burglary.

### A.    Statute of Limitations

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") statute of limitations period for filing a petition for a writ of federal habeas corpus is one year, and it begins to run on the date judgement became final.  28 U.S.C. § 2244(d)(1).  The AEDPA statute of limitations is not currently at issue in this case.

### B.    Procedural Default

The procedural default doctrine serves to bar review of federal claims that a state court has declined to address when a petitioner does not comply with a state procedural requirement. *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977).  In these cases, "the state judgment rests on independent and adequate state procedural grounds." *Coleman,* 501 U.S. at 730.  For purposes of procedural default, the state ruling with which the federal court is concerned is the "last explained state court judgment." *Munson v. Kapture*, 384 F.3d 310, 314 (6th Cir. 2004) citing *Ylst v. Nunnemaker*, 501 U.S. 797, 805 (1991) (emphasis removed).  When the last explained state court decision rests upon procedural default as an "alternative ground," a federal district court is not required to reach the merits of a habeas petition. *McBee v. Abramajtys*, 929 F.2d 264, 265 (6th Cir. 1991).  In determining whether a state court has addressed the merits of a petitioner's claim, federal courts must rely upon the presumption that there is no independent and adequate state grounds for a state court decision absent a clear statement to the contrary. *Coleman*, 501 U.S. at 735.

Applying this presumption, the Sixth Circuit Court of Appeals established a four-pronged analysis to determine whether a claim has been procedurally defaulted. *Maupin v. Smith*, 785 F.2d 135 (6th Cir. 1986).  Under the *Maupin* test, a reviewing court must decide:

    (1)    whether the petitioner failed to comply with an applicable state procedural rule;

    (2)    whether the state courts actually enforced the state procedural sanction;

    (3)    whether the state procedural bar is an "adequate and independent" state ground in which the state can foreclose federal review; and

    (4)    if the above are met, whether the petitioner has demonstrated "cause" and "prejudice."

*Id.* at 138.

-8-

Under the first prong of *Maupin*, there must be a firmly established state procedural rule applicable to the petitioner's claim and the petitioner must not have complied with the rule. *Ford v. Georgia*, 498 U.S. 411, 423-24 (1991) (state procedural bar that is not "firmly established and regularly followed" cannot serve  to bar federal judicial review); *Franklin v. Anderson*, 434 F.3d 412, 418 (6th Cir. 2006).  The question of whether a state procedural rule was "firmly established and regularly followed" is determined as of the time at which it was to be applied. *Richey v. Mitchell*, 395 F.3d 660, 680 (6th Cir. 2005).

Under the second prong, the last state court to which the petitioner sought review must have invoked the procedural rule as a basis for its decision to reject review of the prisoner's federal claims. *Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991) (appeal dismissed for lack of jurisdiction); *Richey*, 395 F.3d at 678 ("a lapsed claim survives if the state court overlooked the default and decided the claim anyway"); *Baze v. Parker*, 371 F.3d 310, 320 (6th Cir. 2004) (if a state court does not expressly rely on a procedural deficiency, then a federal court may conduct habeas review); *Gall v. Parker*, 231 F.3d 265, 310 (6th Cir. 2000) (even if issue is not raised below, where state supreme court clearly addresses the claim, no procedural bar arises); *Boyle v. Million*, 201 F.3d 711, 716-17 (6th Cir. 2000) (where a state appellate court characterizes its earlier decision as substantive, the earlier decision did not rely on a procedural bar; therefore, the cause and prejudice test does not apply).

Under the third prong, a state judgment invoking the procedural bar must rest on a state law ground that is both independent of the merits of the federal claim and is an adequate basis for the state court's decision.  *Munson v. Kapture*, 384 F.3d 310, 313-14 (6th Cir. 2004).

Under the fourth prong, a claim that is procedurally defaulted in state court will not be reviewable in federal habeas corpus unless the petitioner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or that failure to consider the claim will result in a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 751.  "Cause" is a legitimate excuse for the default, and "prejudice" is actual harm resulting from the alleged constitutional violation. *Magby v. Wawrzaszek*, 741 F.2d 240, 244 (9th Cir. 1984), *cert. denied*, 490 U.S. 1068 (1985).  If a petitioner fails to show cause for his procedural default, the reviewing court

need not address the issue of prejudice.  *Smith v. Murray*, 477 U.S. 527 (1986).

Simply stated, a federal court may review federal claims:

> that were evaluated on the merits by a state court. Claims that were not so evaluated, either because they were never presented to the state courts (i.e., exhausted) or because they were not properly presented to the state courts (i.e., were procedurally defaulted), are generally not cognizable on federal habeas review.

*Bonnell v. Mitchel,* 301 F.Supp.2d 698, 722 (N.D. Ohio 2004).  The above standards apply to the Court's review of Petitioner's claims.

## V.    STANDARD OF REVIEW

If Petitioner's claims overcome the procedural barriers of time limitation, exhaustion and procedural default, AEDPA governs this Court's review of the instant case because Petitioner filed his petition for the writ of habeas corpus pursuant to 28 U.S.C. § 2254 well after the act's effective date of April 26, 1996.  *Harpster v. Ohio*, 128 F.3d 322, 326 (6th Cir. 1997), *cert. denied*, 522 U.S. 1112 (1998).  Under Section 2254, a state prisoner is entitled to relief if he is held in custody in violation of the United States Constitution or laws or treaties of the United States.  28 U.S.C. § 2254(d).

The AEDPA sets forth the standard of review for the merits of a petition for the writ of habeas corpus.  The AEDPA provides:

> (d)    An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1)    resulted in a decision that was *contrary to*, or involved an *unreasonable application of*, clearly established Federal law,

as

> determined by the Supreme Court of the United States; or
>
> (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (emphasis added).  In *Williams v. Taylor*, the Supreme Court clarified the language of 28 U.S.C. § 2254(d) and stated:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court

-10-

> has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Williams v. Taylor*, 529 U.S. 362, 412-13 (2000).  Furthermore, the Supreme Court declared that "a federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Id.*  Elaborating on the term "objectively unreasonable," the Court stated that "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.*; *see also Bailey v. Mitchell,* 271 F.3d 652, 655-56 (6th Cir. 2001).

The Sixth Circuit Court of Appeals offers the following guidelines for applying the AEDPA limitations:

> A.    Decisions of lower federal courts may not be considered.
>
> B.    Only the holdings of the Supreme Court, rather than its dicta, may be considered.
>
> C.    The state court decision may be overturned only if:
>> 1.    It '[applies] a rule that contradicts the governing law set forth in [Supreme Court of the United States] cases,' [the Supreme Court precedent must exist at the time of petitioner's direct appeal] or;
>>
>> 2.    the state-court decision 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [Supreme Court] precedent;' or
>>
>> 3.    'the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case;' or
>>
>> 4.    the state court 'either unreasonably extends a legal principle from [a Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.'
>
> D.    Throughout this analysis the federal court may not merely apply its

own views of what the law should be. Rather, to be overturned, a state court's application of Supreme Court of the United States precedent must also be objectively unreasonable.  That is to say, that 'a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.'  'An unreasonable application of federal law is different from an incorrect or erroneous application of federal law.'

E.     Findings of fact of the state courts are presumed to be correct. 'The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.'

*Bailey v. Mitchell,* 271 F.3d 652, 655-56 (6th Cir. 2001) (internal citations omitted).

Finally, a reviewing federal court is bound by the presumption of correctness, under which the federal court is obligated to "accept a state court's interpretation of the state's statutes and rules of practice."  *Hutchinson v. Marshall*, 744 F.2d 44, 46 (6th Cir. 1984), *cert. denied*, 469 U.S. 1221 (1985); *see also Duffel v. Duttion*, 785 F.2d 131, 133 (6th Cir. 1986).  The presumption of correctness is set forth in 28 U.S.C. § 2254(e), which provides:

(e)(1)In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.

28 U.S.C. § 2254(e).  The presumption of correctness applies to basic primary facts, and not to mixed questions of law and fact.  *Levine v. Torvik*, 986 F.2d 1506, 1514 (6th Cir. 1993), *cert. denied*, 509 U.S. 907 (1993).  The presumption also applies to "implicit findings of fact, logically deduced because of the trial court's ability to adjudge the witnesses' demeanor and credibility."  *McQueen v. Scroggy*, 99 F.3d 1302, 1310 (6th Cir. 1996), *cert. denied*, 520 U.S. 1257 (1997).  Furthermore, a reviewing federal court is not free to ignore the pronouncement of a state appellate court on matters of law.  *See Central States, Southeast & Southwest Areas Pension Fund v. Howell*, 227 F.3d 672, 676, n.4 (6th Cir. 2000).  Petitioner has the burden of rebutting the presumption of correctness by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).

## VI.   **ANALYSIS**

### A.   **Procedural Default**

-12-

Respondent contends that Petitioner has procedurally defaulted his second and third grounds for relief in the instant petition because he failed to present them to the Ohio appellate court. ECF Dkt. #8 at 74-76.

Petitioner's second ground for relief in the instant petition challenges the sufficiency of the evidence with regard to his aggravated burglary convictions. ECF Dkt. #1 at 27-28. His third ground for relief asserts the insufficiency of the evidence to convict him of aggravated robbery. *Id*. at 28-29. Respondent contends that while Petitioner raised these grounds for relief in his memorandum in support of jurisdiction before the Supreme Court of Ohio, he failed to present them to the Eighth District Court of Appeals of Ohio. ECF Dkt. #8 at 76. Respondent concedes that the issues of sufficient evidence of aggravated burglary and aggravated robbery were discussed in Petitioner's brief before the Ohio appellate court. *Id*. However, Respondent asserts that Petitioner discussed these crimes only to support his sole assignment of error alleging the insufficiency of evidence to convict him of aggravated murder because aggravated burglary and robbery are predicate offenses for the felony murder counts and are the specifications for the two other aggravated murder counts. *Id*.

Respondent is correct that in his brief to the Ohio appellate court, Petitioner asserted only one assignment of error:

> THE VERDICTS FINDING THE APPELLANT GUILTY OF AGGRAVATED MURDER WAS VIOLATIVE OF DUE PROCESS AS IT WAS BASED UPON LEGALLY INSUFFICIENT EVIDENCE.

ECF Dkt. #8-1 at 110-111, 115-137. However, in his brief discussing this assignment of error, Petitioner discussed the sufficiency of the evidence as to his convictions for aggravated burglary and aggravated robbery. Petitioner asserted that while his trial counsel did not challenge the sufficiency of the evidence that he was involved in the homicides of Richard Messina and Sandra Cover, defense counsel did argue that insufficient evidence existed to show Petitioner's role in those murders. *Id*. at 39. Petitioner stated that: "the evidence fell short of establishing: 1) that the killings were during the course of an Aggravated Burglary; 2) that the killings were during the course of an Aggravated

-13-

Robbery; 3) That the Appellant was either the principal offender or that the killing was committed with prior calculation and design." *Id.* Petitioner cited to the applicable law in his appellate brief and divided his analysis of each of these assertions in a section labeled "The Present Case" which began with a subsection labeled "Aggravated burglary evidence." *Id.* at 128. Petitioner argued in this subsection that even if force, stealth or deception were used to enter the Messina residence, the State of Ohio failed to prove that Tabitha did not have license to enter the residence since she lived there part-time and had a bedroom there and therefore could invite Petitioner in as her guest, thereby negating a trespass. *Id.* In the second section, entitled "Aggravated robbery evidence," Petitioner asserted that while sufficient evidence existed to show that Richard Messina's cars and cigarette lighter were taken, no nexus existed between those thefts and the violence necessary to establish aggravated robbery because insufficient evidence showed that the harm to the victims was inflicted during the theft or in fleeing thereafter. ECF Dkt. #8-1 at 128. Petitioner also indicated in his notice of appeal to the Ohio appellate court that he was giving notice "that he will appeal, on questions of law, his conviction and sentence for Aggravated Murder..., Aggravated Robbery; and Aggravated Burglary." ECF Dkt. #8-1 at 110.

The rest of Petitioner's appellate brief was devoted to the argument that the evidence was insufficient to find him guilty of aggravated murder. ECF Dkt. #8-1 at 129-134.

The undersigned recommends that the Court address Petitioner's second and third grounds for relief on the merits as while he did not formally present them as separate and distinct assignments of error, they were nevertheless presented and the Ohio appellate court addressed them, albeit in the context of the sufficiency of the evidence to convict Petitioner of the aggravated murder charges. Moreover, the United States Supreme Court has observed that federal courts are not required to address a procedural default issue before deciding against a petitioner on the merits. *Lambrix v. Singletary*, 520 U.S. 518, 525, 117 S.Ct. 1517, 137 L.Ed.2d 771 (1997). The Sixth Circuit has also approved this rule where the procedural default question is complicated and unnecessary to the court's determination of the case. *Hudson v. Jones*, 351 F.3d 212, 215–16 (6th Cir.2003); *Jackson v. Anderson*, 141 F.Supp.2d 811, 826–27 (N.D.Ohio 2001).

-14-

Accordingly, the undersigned provides analysis and recommendations as to all of Petitioner's grounds for relief.

**B**.        **Sufficiency of the Evidence**

In each of his grounds for relief, Petitioner asserts that insufficient evidence was presented in order to convict him.  ECF Dkt. #1 at 21-29.

An allegation that the verdict was entered upon insufficient evidence states a claim under the due process clause of the Fourteenth Amendment to the United States Constitution.  *Jackson v. Virginia*, 443 U.S. 307, *reh'g denied*, 444 U.S. 890 (1979), *and In re Winship*, 397 U.S. 358 (1970). On federal habeas corpus review, the District Court cannot weigh the credibility of the witnesses. *Walker v. Engle*, 703 F.2d 959, 969.  Nor is the District Court permitted to overturn a conviction merely because it would have acquitted had it acted as the finder of fact.  *Brown v. Davi*s, 752 F.2d 1142, 1147 (6$^{th}$Cir. 1985), *and Walker,* 703 F.2d at 969.  In order to establish an insufficiency of the evidence claim, the first relevant inquiry is "whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Scott v. Mitchell,* 209 F.3d 854, 885 (6th Cir. 2000), *quoting Jackson,* 443 U.S. at 319. The inquiry is not whether the trier of fact made the *correct* determination of guilt or innocence, but whether it made a *rational* decision to acquit or convict.  *Williams v. Haviland,* No. 1:05CV1014, 2006 WL 456470, *3 (N.D.Ohio Feb. 24, 2006), citing *Herrera v. Collins,* 506 U.S. 390, 402, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993).  If sufficient evidence exists with which to convict, the inquiry ends.  If the Court finds that the evidence is insufficient to convict, then it must apply the AEDPA deference standard and defer to the state appellate court's sufficiency determination as long as it is not "objectively unreasonable" in concluding to the contrary, keeping in mind that it is looked at "with explicit reference to the substantive elements of the criminal offense as defined by state law." *Nance v. Smith*, No. 1:09CV1536, 2010 WL 5817645, at *2 (N.D. Ohio Dec. 3, 2010)*, quoting *Brown v. Konteh,* 567 F.3d 191, 205 (6th Cir. 2009) and *White v. Steele*, 602 F.3d 707, 710 (6th Cir. 2009).  Moreover, it must be remembered that the Court presumes the findings of fact of the state court are correct and the petitioner bears the burden of rebutting this presumption

-15-

by clear and convincing evidence. 28 U.S.C. § 2254(e) (1); *Davis v. Lafler*, 609 F.3d 870, 875 (6th Cir.2010).  Further, "[a] conviction may be sustained based upon nothing more than circumstantial evidence."  *Saxton v. Sheets*, 547 F.3d 597, 606 (6th Cir. 2008), quoting *United States v. Kelley*, 461 F.3d 817, 825 (6th Cir.2006)("Circumstantial evidence alone is sufficient to sustain a conviction and such evidence need not remove every reasonable hypothesis except that of guilt.").

Although the Ohio appellate court in the instant case did not cite to United States Supreme Court precedent in its decision addressing Petitioner's sufficiency of the evidence claim, the case that the court did identify, *State v. Jenks*, relies upon the standard of review established by the Supreme Court in *Jackson*.  ECF Dkt. #8-1 at 165, citing 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), citing *Jackson*, 443 U.S. 307.  Accordingly, the "relevant question is whether, after reviewing the evidence in a light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Jackson*, 443 U.S. at 319.  In *Jackson*, the Supreme Court explained that the State is not required under the Due Process Clause to rule out every hypothesis except that of guilt beyond a reasonable doubt.  *Id.* at 326. Rather, "a federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume-even if it does not affirmatively appear in the record-that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution."  *Id.*; *see also Walker v. Engle*, 703 F.2d 959, 969-70 (6th Cir.), *cert. denied*, 464 U.S. 951, 962, 104 S.Ct. 367, 78 L.Ed.2d 327 (1983).

## 1.     Aggravated Murder Convictions

In his first ground for relief, Plaintiff contends that insufficient evidence was presented to convict him of aggravated murder in violation of ORC § 2903.01(A) because the state failed to present evidence that he had sufficient time to deliberate and plan the killing of the victims in this matter.  ECF Dkt. #1 at 21.  Petitioner cites to a number of Ohio cases as support for his assertion that insufficient evidence was presented of prior calculation and design.  *Id*. at 24-27.  He asserts that "there is no evidence of what happened to precipitate the offense.  When and how the decision to strike was made is pure conjecture."  *Id*. at 26.  He also contends that no evidence showed that he

-16-

went beyond the "impulse of the moment" and therefore prior calculation and design was not proven. *Id*. at 27, citing *State v. Claytor* (1991), 61 Ohio St.3d 234.

ORC § 2903.01(A) provides in relevant part that "[n]o person shall purposely, and with prior calculation and design, cause the death of another." Ohio Rev. Code § 2903.01(A). The Ohio Supreme Court has held that "no bright-line test" exists that "emphatically distinguishes between the presence or absence" of prior calculation and design. *State v. Taylor*, 78 Ohio St.3d 15, 20, 676 N.E.2d 82, 89 (1997). However, "'prior calculation and design' is a more stringent element than the deliberate and premeditated malice * * * required under prior law.*" State v. Coley*, 93 Ohio St.3d 253, 263, 754 N.E.2d 1129 (2001), quoting *State v. Cotton*, 56 Ohio St.2d 8, 381 N.E.2d 190 (1978), paragraph one of the syllabus. Prior calculation and design requires evidence of more than momentary deliberation; it requires "a scheme designed to implement the calculated decision to kill." *Cotton*, 56 Ohio St.2d 8, 381 N.E.2d at 193 (1978). Although "[n]either the degree of care nor the length of time the offender takes to ponder the crime beforehand are critical factors in themselves," a few moments of deliberation is insufficient. *Goodwin v. Johnson*, 632 F.3d 301, 313 (6th Cir. 2011), quoting *State v. D'Ambrosio*, 67 Ohio St.3d 185, 616 N.E.2d 909, 918 (1993) (quoting the 1973 Legislative Service Commission Comment to Ohio Rev.Code § 2903.01). However, "[p]rior calculation and design can be found even when the killer quickly conceived and executed the plan to kill within a few minutes." *Goodwin*, 632 F.3d at 313, quoting *Coley*, 93 Ohio St.3d 253, 754 N.E.2d at 1143. A jury may also consider the manner in which the victim was killed in order to reasonably find that the defendant committed the crime with prior calculation and design. *Goodwin*, 632 F.3d at 313, citing *State v. Palmer*, 80 Ohio St.3d 543, 687 N.E.2d 685, 706 (1997).

As pointed out by the Sixth Circuit Court of Appeals, Ohio courts have enumerated relevant factors in order to determine whether a defendant committed a homicide with prior calculation and design:

> whether the accused knew the victim prior to the crime, as opposed to a random meeting, and if the victim was known to him whether the relationship and [sic] been strained; whether thought and preparation were given by the accused to the weapon he used to kill and/or the site on which the homicide was to be committed as compared to no such thought or preparation; and whether the act was drawn out over

-17-

a period of time as against an almost instantaneous eruption of events.

*Goodwin*, 632 F.3d at 313, quoting *State v. Jenkins*, 48 Ohio App.2d 99, 355 N.E.2d 825, 828 (1976).  The *Goodwin* Court further noted that "[w]e have previously held the 'prior calculation and design' requirement under Ohio law was satisfied where 'the purpose to cause the death was reached by a definite process of reasoning in advance of the homicide, which process of reasoning must have included a mental plan involving studied consideration of the method and the instrument with which to cause the death of another.'" *Goodwin*, 632 F.3d at 313, quoting *Zuern v. Tate*, 336 F.3d 478, 482 (6th Cir. 2003).

The undersigned recommends that the Court find no merit to Petitioner's assertion.  In addressing Petitioner's assertion, the Ohio appellate court found:

> In considering an argument concerning prior calculation and design, the test is whether the evidence "reveals the presence of sufficient time and opportunity for the planning of an act * * * , and the circumstances * * * show a scheme designed to implement the calculated decision to kill * * * ."  State v. Cotton (1978), 56 Ohio St.2d 8, paragraph 3 of the syllabus; see, also, State v. Moreland (1990), 50 Ohio St.3d 58; State v. Taylor, 78 Ohio St.3d 15, 1997-Ohio-243.
>
> The evidence in this case demonstrated the murders were planned.  The private conversations between Tabitha and appellant, the length of time the two of them were away from Jason in the hours between approximately 3:00 a.m. and 6:00 a.m., the removal of the lightbulbs from the outdoor fixtures, the careful placement of the garden tools they decided not to use, and the stealth involved in order to enter the master bedroom without waking the sleeping and half-naked victims all indicate the necessary "studied analysis" of a plan and method of attack.  *State v. McClain* (Jan. 14, 1993), Cuyahoga App. No. 61541; cf., *State v. Jenkins* (1976), 48 Ohio App.2d 99.

ECF Dkt. #8-1 at 166.

Upon review of the transcript and the Ohio appellate court's determination, the undersigned recommends that the Court find that sufficient evidence was presented upon which a rational trier of fact could find that Petitioner acted with prior calculation and design in killing the victims and the Ohio appellate court's determination was not contrary to or an unreasonable application of the law.  As pointed out by the appellate court, evidence was presented showing that prior to the murders, Tabitha had an argument on the phone with

-18-

Richard Messina about a cell phone and Petitioner had a physical altercation with Richard Messina upon returning the cell phone to Richard for Tabitha.  ECF Dkt. #8-2 at 309-311. Petitioner informed Tabitha and the others about the altercation upon his return and Tabitha was observed to be "[h]appy excited" about the altercation.  *Id*. at 310-311.  Petitioner and Tabitha then engaged in a "private discussion" away from their fiancees, telling them to stay back ten to twenty feet while they talked privately for fifteen to twenty-five minutes.  *Id*. at 311.  Evidence was presented also showing that Richard Messina called the police to report the altercation with Petitioner and he reported that he believed Petitioner was bothering his cars parked in the driveway.  ECF Dkt. #8-3 at 439-443.  He informed Officer Khoenle that he did not want Petitioner around his property anymore.  *Id*.  Officer Khoenle told Petitioner not to return to the Messina house and Petitioner agreed.  *Id.* at 445.  Officer Khoenle advised Petitioner about the crime of criminal trespass if he returned to the Messina residence.  *Id.* Officer Khoenle testified that he also told Tabitha and the others not to return to the Messina residence, but he took Tabitha back to the house after she expressed wanting to get some of her property.  *Id.*

While retrieving her dog and driver's license at the Messina residence, Tabitha and Richard argued in front of Officer Khoenle and Officer Khoenle testified that "Richard said he didn't want her back at the house."  ECF Dkt. #8-3 at 446-448.  Officer Khoenle returned Tabitha to her friends and advised "all parties * * *  not to return" to the Messina residence. *Id.*; *see also* ECF Dkt. #8-2 at 317.  Tammy, Petitioner's girlfriend who was with them up until this point, was picked up by her mother and taken home.  ECF Dkt. #8-2 at 317-319.

Shortly thereafter, Tabitha told Jason that she and Petitioner were going to get Tammy to come back and that he should wait for them.  ECF Dkt. #8-2 at 320-321.  Jason testified that Tabitha appeared anxious and jittery at that time, although she did not appear to be under the influence of drugs.  *Id.* at 322-323.  Petitioner and Tabitha were gone for a few hours, so long that Jason called Tammy at 3:30 a.m. and she informed him that she had not seen them.  *Id.* at 321.  At 4:00 a.m., South Euclid police officer Dustin Smoot saw Petitioner and Tabitha

sitting together on the sidewalk in front of the school, "holding hands and talking with each other." ECF Dkt. #8-3 at 461. Jason testified that when Petitioner and Tabitha finally returned, Petitioner had a cut underneath his eye and Tabitha had a cut on her hand. ECF Dkt. #8-2 at 324. Jason stated that Petitioner and Tabitha lied to him when he asked where they were as they told him that went to Tammy's house and could not find her. *Id.* at 325. Jason testified that Petitioner and Tabitha left again and returned a couple of hours later wearing different clothes and driving Richard Messina's cars with his dogs in the cars. *Id.* at 125-127.      The altercation between Petitioner and Richard Messina establishes that they knew one another and had a strained relationship, which was further reinforced by Richard Messina telling Officer Khoenle that he did not want Petitioner near his property. The evidence also shows that Tabitha had a strained relationship with her father Richard Messina in that she had a heated conversation with him that night over a cell phone and her fiancée Jason had testified that Tabitha would sometimes steal one of his cars when she had an outburst against him. ECF Dkt. #8-2 at 309, 329-330. Richard Messina's son, Rick Messina, Jr., Tabitha's stepbrother, also testified about the strained relationship between Richard Messina and Tabitha. ECF Dkt. #8-3 at 519. Like Petitioner, Officer Khoenle also warned Tabitha not to return to the Messina house. ECF Dkt. #8-3 at 446-448. Moreover, viewing the circumstantial evidence presented in a light most favorable to the prosecution, the private conversation that Petitioner and Tabitha had out of the earshot of their own respective fiancees prior to the homicides also demonstrates sufficient evidence upon which a rational juror could find prior calculation and design. Both Jason and Tammy testified that Petitioner and Tabitha told them to stay away from them far enough so that they could not hear the conversation between Petitioner and Tabitha. *Id*. at 310-312, 388-389. Petitioner and Tabitha also left Jason on one occasion and lied to him about their whereabouts during that time period. *Id*. at 320-321. They then returned and Petitioner had a cut underneath his eye and Tabitha had a cut on her hand. *Id*. at 324-326.

The injuries to the victims also demonstrate evidence of prior calculation rather than

an instantaneous eruption of events as asserted by Petitioner, in that Richard Messina's body had suffered

> six * * * chop wounds to the right side of his head and neck and several other blunt force injuries * * * on his head, right shoulder, and * * * right leg.
>
> Two of the chop wounds fractured of the fifth cervical vertebra and transected an artery called the vertebral artery that runs alongside the vertebral column on that side.

ECF Dkt. #8-2 at 259, 262. "If the victim is killed in a cold-blooded, execution-style manner, the killing bespeaks aforethought, and a jury may infer prior calculation and design." *State v. Marcum*, No. 10-CA-0137, 2011 LW 2520150, at *11 (Ohio App. 5th Dist., June 23, 2011), citing *State v. Campbell,* 90 Ohio St.3d 320, 330, 738 N.E.2d 1178( 200); *State v. Palmer*, 80 Ohio St.3d 543, 570, 687 N.E.2d 685 (1997); *State v. Taylor*, 78 Ohio St.3d 15, 21, 676 N.E.2d 82 (1997); and *State v. Mardis*, 134 Ohio App.3d 6, 19, 729 N.E.2d 1272 (Ohio App. 10th Dist. 1999).

The coroner testified that Richard Messina's wounds were consistent with an ax or a hatchet. ECF Dkt. #8-2 at 260. The coroner also testified that "any or all" of the wounds could have rendered Richard Messina "immobile or unconscious." *Id*. at 262. She further stated that due to a lack of defensive wounds on Richard Messina, "I don't think that much of a fight was put up." *Id.* at 269. The coroner also testified that Sandra Cover had "multiple blunt force injuries to her head, torso, and extremities." *Id.* at 271. The coroner testified that Ms. Cover's sustained seven to ten applications of blunt force to Ms. Cover's head, and approximately fifteen applications of force to her trunk and extremities. *Id*. at 280. She estimated that Ms. Cover sustained "as many as 25 and as few as 22 or 23" blunt force injuries. *Id.* at 281. She testified that abrasions and contusions found on Ms. Cover's hand, as well as a broken index finger, may be consistent with defensive-type wounds. *Id*. at 279.

Moreover, other items found by the police investigating the scene provide additional circumstantial evidence supporting a finding of prior calculation and design. Police found that

the screen to the door had been cut, door windows were broken, an unused hatchet was lying on the bed in Tabitha's room, two screwdrivers, a machete and shovel were found inside and outside the house, and light bulbs from the outdoor floodlights had been removed and "placed out neatly" on the ground.  ECF Dkt. #8-3 at 545, 560-562, 567, 597-602.  Police also found in the shrubbery outside of the house a hat that Petitioner was wearing loaned to him by Jason and a "gray muscle shirt and a white female tank type shirt that had wrapped within them a steak knife." ECF Dkt. #8-2 at 350; ECF Dkt. #8-3 at 597-602.  The clothing was identified as that of Petitioner and Tabitha and Jason had testified that when they returned with the Messina vehicles and dogs, they had changed their clothes.  ECF Dkt. #8-2 at 328-329.  This establishes that Petitioner and Tabitha had violated the police warnings not to return to the Messina residence.

Jason testified that Petitioner and Tabitha thereafter left again with the promise that they would "be right back."  ECF Dkt. #8-2 at 328-329.  When they returned, they had the two other dogs from the Messina residence and Richard Messina's two vehicles.  *Id.* Jason observed that they were also wearing different clothing.  *Id*.

Based upon this evidence, the undersigned recommends that the Court find that sufficient circumstantial evidence existed in which any rational juror could find that Petitioner committed the murders with prior calculation and design and the Ohio appellate court's decision was not contrary to or an unreasonable application of clearly established Supreme Court law.

### 2.     Aggravated Burglary Convictions

Petitioner also contends that insufficient evidence existed in which to convict him of aggravated burglary.  ECF Dkt. #1 at 27-28.  Petitioner's only assertion in this ground for relief concerns the element of trespass.  *Id*.  He  contends that because Tabitha Messina was a household member of Richard Messina's residence, she was a licensee and could therefore invite Petitioner into the home, thereby negating the element of trespass in order to sustain an aggravated robbery conviction.  *Id*. at 28.

-22-

Ohio Revised Code section 2911.11 provides in relevant part:

> 2911.11 Aggravated burglary
>
> (A) No person, by force, stealth, or deception, shall trespass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure, when another person other than an accomplice of the offender is present, with purpose to commit in the structure or in the separately secured or separately occupied portion of the structure any criminal offense, if any of the following apply:
>
>> (1) The offender inflicts, or attempts or threatens to inflict physical harm on another;
>>
>> (2) The offender has a deadly weapon or dangerous ordnance on or about the offender's person or under the offender's control.

Ohio Rev. Code § 2911.11. "Trespass" as used in the aggravated burglary statute, is defined in Ohio Revised Code § 2911.21. *See* Ohio Rev. Code. §§ 2911.10 ("[a]s used in sections 2911.11 to 2911.13 of the Revised Code, the element of trespass refers to a violation of section 2911.12 of the Revised Code."). The relevant definition of criminal trespass in Section 2911.21 of the Ohio Revised Code applicable to the instant case states the following:

> 2911.21 Criminal trespass
>
> (A) No person, without privilege to do so, shall do any of the following:
>
>> (1) Knowingly enter or remain on the land or premises of another;
>>
>> (2) Knowingly enter or remain on the land or premises of another, the use of which is lawfully restricted to certain persons, purposes, modes, or hours, when the offender knows the offender is in violation of any such restriction or is reckless in that regard;

Ohio Rev. Code § 2911.21. "Privilege" is defined in section 2901.01 of the Ohio Revised Code as "an immunity, license, or right conferred by law, bestowed by express or implied grant, arising out of status, position, office, or relationship, or growing out of necessity." Ohio Rev. Code § 2901.01(a)(12).

-23-

The Ohio appellate court in this case found that sufficient evidence of trespass existed to sustain the aggravated burglary convictions because the evidence showed that neither Tabitha nor Petitioner had any privilege to enter the Messina residence after police escorted Tabitha from that residence and told Tabitha, Petitioner, Jason and Tammy not to return to the Messina residence. The undersigned recommends that the Court find that sufficient evidence existed to find that any privilege previously held by Petitioner or Tabitha was revoked by Richard Messina and Petitioner and Tabitha were both informed of this revocation by the police. The trial testimony revealed that Richard Messina called the police and reported the altercation he had with Petitioner and he informed Officer Khoenle that he did not want Petitioner around his property anymore. ECF Dkt. #8-3 at 439-443. Officer Khoenle told Petitioner not to return to the Messina house and Petitioner agreed. *Id.* at 445. Officer Khoenle advised him about the crime of criminal trespass if he returned to the Messina residence. *Id.* Officer Khoenle also testified that he told Tabitha and the others not to return to the Messina residence and Tabitha expressed wanting to return to the residence to get some property, so he took her back to the Messina residence. *Id.* Upon escorting Tabitha back to the residence to retrieve some items, Officer Khoenle testified that Tabitha and Richard Messina argued in front of him and "Richard said he didn't want her back at the house." ECF Dkt. #8-3 at 446-448. Officer Khoenle returned Tabitha to her friends and advised "all parties * * * not to return" to the Messina residence. *Id.*; *see also* ECF Dkt. #8-2 at 317.

Accordingly, any privilege held by Petitioner or Tabitha to enter the Messina residence had been explicitly revoked by Richard Messina and communicated to them by the police. Thus, Tabitha's privilege to invite others such as Petitioner inside the home was also revoked. "A defendant who initially gains entry to one's home by consent may subsequently become a trespasser if consent is withdrawn." *State v. Holloway*, 38 Ohio St.3d 239, 242, 527 N.E.2d 831, 836 (1988), citing *State v. Steffen*, 31 Ohio St.3d 111, 509 N.E.2d 383 (1987).

The Court should find no merit to Petitioner's claim of insufficient evidence of trespass in order to convict him of aggravated burglary and find that the Ohio appellate court's

decision on this issue was not contrary to or an unreasonable application of clearly established United States Supreme Court law.

### 3.  **Aggravated Robbery convictions**

Petitioner also contends that insufficient evidence existed to convict him of aggravated robbery.  ECF Dkt. #1 at 28-29.  Petitioner asserts that the state failed to show that harm was inflicted during a theft offense or in fleeing after an offense.  *Id*. at 29.  He argues that the thefts were an afterthought and thus not part of a robbery, and he cites *State v. Thomas*, 106 Ohio St.3d 133, (2005) in support.

The Ohio appellate court found that sufficient evidence existed to prove aggravated robbery as witnesses testified that they knew that valuables were kept inside the Messina home, some of those items were missing after the murders, and Petitioner was inside of Richard Messina's GMC Jimmy when he was arrested and had Richard Messina's lighter on his person.  ECF Dkt. #8-1 at 167; ECF Dkt. #8-3 at 503-507.  The Ohio appellate court cited *State v. Biros*, 78 Ohio St.3d 426, 451 (1997) in support of its determination.

Ohio's aggravated robbery statute, Ohio Revised Code section 2911.01, provides in relevant part:

> 2911.01 Aggravated robbery
>
> (A) No person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, shall do any of the following:
>
> > (1) Have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it;
> >
> > (2) Have a dangerous ordnance on or about the offender's person or under the offender's control;
> >
> > (3) Inflict, or attempt to inflict, serious physical harm on another.

Ohio Rev. Code § 2911.01.

-25-

In *Biros*, the Ohio Supreme Court held that the defendant "cannot escape the effect of the felony-murder rule by claiming that the aggravated robbery was simply an afterthought." 78 Ohio St. 426, 678 N.E.2d 891, 912 (1997).  The evidence presented in *Biros* showed that the defendant beat the victim, attempted to rape her, and strangled her to death and had taken her ring as he was dragging her body away.  *Id*.  The court held that the defendant's "theft of the ring was *associated with* the killing *as part of one continuous occurrence*."  *Id*. (emphasis in original).  The Supreme Court of Ohio relied upon its holding in *State v. Smith*, 61 Ohio St.3d 284, 290, 574 N.E.2d 510, 516 (1991) that "the victim of a robbery, killed just prior to the robber's carrying off her property, is nonetheless the victim of an aggravated robbery.  The victim need not be alive at the time of asportation."  *Biros*, 678 N.E.2d at 912, quoting *Smith*, 574 N.E.2d at 516.  Other Ohio Supreme Court cases hold the same.  *See State v. Palmer*, 80 Ohio st.3d 543, 571-572, 687 N.E.2d 685, 708-709 (1997)("the question whether he killed before he stole or stole before he killed is of no consequence."); *State v. Williams*, 74 Ohio St.3d 569, 576-578, 660 N.E.2d 724, 732-733 (1996)("[n]either the felony-murder statute nor Ohio case law requires the intent to commit a felony to precede the murder in order to find a defendant guilty of felony-murder specification.").

In the instant case, evidence was presented that the Messina residence was forcibly broken into as police found that the screen to the back porch of the home had been cut, a window was pried open, door windows were broken and an unused hatchet, two screwdrivers, a machete and shovel were found in and around the house.  ECF Dkt. #8-3 at 545, 560-564, 567, 597-604.  In the master bedroom where Richard Messina and Ms. Cover were killed, police observed the room to be in disarray, with a strongbox safe open, papers strewn about, the drawers of a large jewelry box and cigar box removed and emptied, and a large floor safe in the closet opened.  ECF Dkt. #8-3 at 588, 590-592. Jason had testified that he observed that Tabitha had "a lot of money on her" when Petitioner and Tabitha returned with Richard Messina's vehicles and they all decided to go to Georgia.  ECF Dkt. #8-2 at 333-337. Dustin also observed that both Petitioner and Tabitha had "a substantial amount of cash" on them.

-26-

*Id.* at 367.  Jason further testified that he had written in his statement to police that upon their second return to him with the Messina vehicles, Petitioner and Tabitha told him that they had returned to the Messina residence to get the rest of their belongings when Richard Messina and Ms. Cover attacked them.  *Id.* at 358.  Moreover, police observed that both of Richard Messina's vehicles were missing and Petitioner was arrested in Richard Messina's GMC Jimmy.  *Id.* at 610-611.  Police recovered Richard Messina's lighter from Petitioner's person upon his arrest.  *Id.* at 641.  Rick Messina Jr. had testified that he had given his dad the cigarette lighter as a gift.  *Id.* at 527-528.

Viewing this evidence in a light most favorable to the prosecution, the undersigned recommends that the Court reject Petitioner's assertion and find that sufficient evidence existed to show that physical harm was inflicted during a theft offense or in fleeing after the theft offenses.  Moreover, the undersigned recommends that the Court find that the Ohio appellate court did not unreasonably apply clearly established federal law or make an unreasonable determination of this issue in light of the evidence presented at trial as to aggravated robbery.

**VII.**   **CONCLUSION AND RECOMMENDATION**

For the foregoing reasons, the undersigned RECOMMENDS that the Court DISMISS the instant petition in its entirety with prejudice.

DATE: May 10, 2012                        */s/ George J. Limbert*
                                           GEORGE J. LIMBERT
                                           UNITED STATES MAGISTRATE JUDGE


ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of service of this notice. Fed. R. Civ. P. 72; L.R. 72.3. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. L.R. 72.3(b).